## SALISBURY v. PEDIFORME SHOE CO., Inc., et al.
### No. 334.

District Court, E. D. New York.
Jan. 24, 1940.

Clarence G. Campbell, of New York City, for plaintiff.

Munn, Anderson & Liddy, of New York City (John H. Glaccum, of New York City, of counsel), for defendants.

CAMPBELL, District Judge.

This is an action for the alleged infringement of Patent No. 1,455,887 issued to Orlando B. Salisbury for Shoe, granted May 22nd, 1923, on an application filed September 12th, 1921.

This suit is based only on Claim 1 of the patent.

The defendant by answer interposed the defenses of invalidity and non-infringement.

The plaintiff has not been engaged in the shoe business, but is a retired pharmacist.

The defendant, Pediforme Shoe Company, Inc., is the operator of a retail shoe store at 36 West 36th Street, New York, N. Y., and the defendant, S. Waterbury & Son Co., Inc., manufactured the children's shoes sold by the defendant, Pediforme Shoe Company, Inc. The men's shoes, with which we are here concerned, are manufactured by Thompson Brothers of Brockton, Massachusetts.

Plaintiff contends that style Nos. 364 and 405 (Exhibit 4); style No. 500 (Exhibit 5); style No. 600 (Exhibit E); and style No. 70 (Exhibit 6) infringe. Of these, Exhibits 4 and 6 are manufactured by the defendant, S. Waterbury & Son Co., Inc., and Exhibits 5 and E were manu-

factured by Thompson Brothers. All of the Exhibits are admittedly sold by Pediforme.

The plaintiff is the owner of the patent in suit, and the notice required by law, before the commencement of the suit, was given.

The shoe in question is a corrective shoe of a drastic orthopedic type, and the principal feature of the shoe is described in the specification of·the patent in suit (Exhibit 1) as follows: "This metatarsal portion is continued along the deflecting sides from the first 1" and fifth 5" metatarsophalangeàl joint to the end of the extension ii′ forming the toe portion C having the inner and outer toe edge on a straight line with the waist f f′ and lower j or upper j′ side of the heel before the turn of said extension i i′ in front (about three-fourths of an inch) toward the median line m or division of the longitudinal arch and third 3 and fourth 4 toe as shown in Fig. 2. Or on a straight line with the first 1 and fifth 5 metatarsal bone are the normal large 1 and little 5 toe bones before the turn of the extension i i′ in front toward the median line m as illustrated in Fig. ·2."

I am in doubt whether from that quotation, or a reading of the patent as a whole, anything is taught even to one skilled in the art, but it seems clear to me that the principal thing that the patentee claims as his invention, is the straight line running from the heel along the inner and outer edge of the foot.

This suit is based only on Claim 1, which reads as follows: "1. A shoe or footwear consisting of a heel portion, a metatarsal portion, and a toe portion having the inner toe edge on a straight line with the deflected lower side of said heel portion before the turn of the extension in front toward the median line of the wearer's toes, substantially as shown and described."

The shoe shown and described in the patent has both edges on a straight line, while the claim calls only for the toe portion having the inner toe edge on a straight line.

There are many other features and elements of the Salisbury shoe, such as the steel spring or removable brace, and similar elements set forth in the specification and claims, but none of these were discussed at the trial, and do not appear in the defendant's shoes.

The patent in suit was before this Court in the action of Salisbury v. Julius Grossman, Inc., et al., D.C., 22 F.Supp. 102, wherein the Court found no infringement, and further said "Whether or not the plaintiff has a valid patent is a moot question."

As I have before stated, the plaintiff is a retired pharmacist, and not a shoe man. He contends that he conceived the idea of his shoe in 1901, but there was no reduction to practice until December, 1909, when he had a pair of shoes made for him by one Anders K. Brander.

During the period between 1901 and 1909 he did nothing about his alleged invention.

He further contends that between 1909 and 1919 he was experimenting with, and improving, his shoe. During that period, some twelve or fifteen pairs of shoes were made, all of them being worn by the plaintiff in public, and he says that he had several chances to sell them, but did not.

I cannot agree with plaintiff's contention that he was experimenting with, and improving, the model of his shoe between 1909 and 1919, because the only improvement that was testified to, by Mr. Brander, who made the plaintiff's shoes, between those dates, was that the first last brought to him by plaintiff, was so high over the toe that it was almost impossible to last the shoes, and plaintiff altered that. This was done, as nearly as Mr. Brander could fix the time, in 1910 or 1911. The only· other changes made, so far as I can determine from the evidence, were attempts by the plaintiff to make the shoe more comfortable for his foot by leathering the same, but there were no other changes in the last.

Prior to 1916, that is about 1914, when Mr. Garrod had the store in East 36th Street, New York City, which was afterwards occupied by Pediforme, plaintiff saw the shoes carried by Mr. Garrod and was familiar with them, and also had one of Mr. Garrod's catalogues (Exhibit B), which plaintiff lost in 1926. This catalogue was issued and distributed both over the counter and by mail, prior to 1916.

As I read the plaintiff's testimony, his invention consisted in making a drawing of his own foot, and having a last made therefrom, and he says that there was no change in lasts (Exhibits 8 and 9), from the earlier lasts as to a straight inner edge, from 1909 when he had the last made from his drawing, but that he had the

same outline, and never changed it at all, except to fit it to his particular foot.

Upon the issuance of the patent to plaintiff, he wrote to, and interviewed, in all, about one hundred and twenty-five shoe manufacturers, but none of them were interested in his shoe.

This patent will expire in 1940, but the shoe has never been put into commercial production, nor does the record show that shoes made in accordance with the patent have been worn ever, by anyone except the plaintiff himself.

In addition to the suit brought by the plaintiff against Julius Grossman, Inc., supra, in which it was proven that Grossman had manufactured their shoes many years before the application for the patent in suit was filed, plaintiff brought two other suits, which never went to trial, but were settled for small sums, such settlements carrying with them a license for the balance of the term of the patent, but without the payment of any further royalty.

Plaintiff had approached both of these defendants many times, but they declined to consider the question of license.

We will now consider the question of infringement, and in so doing will distinguish between the shoes made by Waterbury for Pediforme, and those made by Thompson Brothers.

Style No. 500 (Exhibit 5), and style No. 600 (Exhibit E) are shoes made by Thompson Brothers, being substantially identical, the sole difference between them being that style No. 500 is a high shoe, and style No. 600 is a low shoe.

Exhibit H is a photostat of an insole made in accordance with the patent in suit. Reading Claim 1, and disregarding the preamble of the claim, which is common to every shoe, and applying it to Exhibit H, we find the toe portion having an inner toe edge on a straight line with the deflected lower side of the heel. A line has been drawn on the photostat to show a straight line.

If Claim 1 be applied to the Pediforme shoe, (Exhibit 7), it will be found that there is apparently a straight line for a short distance along the inner edge of the sole, but the sole deflects inwardly long before the turn of the extension.

It is common to all shoes that there is a point where a straight line, drawn from the heel to the inner edge of the toes, will contact both places, but the extent of prolongation of the point of contact depends upon the shape of the shoe. There is a much greater area of contact in the plaintiff's shoe, than in the Pediforme shoe, and I greatly doubt that the inner edge of the Pediforme shoe (Exhibit H) may be said to be a straight line.

The defendant, S. Waterbury & Son Co., Inc., were the manufacturers of style Nos. 364 and 405 (Exhibit 4), and these two styles differ only in that No. 364 is an open top shoe or strap shoe, while style No. 405 is a laced shoe.

The insole of Exhibit 4 has been photostated and offered as Exhibit M. A straight line drawn along from the heel to the edge of the inner toes touches the insole only at the ball of the toe.

The insole of style No. 364 has been photostated and offered as Exhibit X and a straight line drawn along the edge of the inner toes touches the insole only at the ball.

The insole (Exhibit V) of Pediforme shoe style No. 70 (Exhibit 6) shows a straight line drawn from the heel touches only at the outer edges of the toes and that a straight line drawn along the inner edge of the toes would cross the heel. The shape of this shoe is substantially the same as that shown in Burt Patent No. 984,506.

Plaintiff objects to the drawing of the lines on the photostats of the insoles, and contends that, that is not the way in which it was intended by the patent to determine whether the inner toe edge is on a straight line with the deflected lower side of the heel portion.

Plaintiff's contention has not, in my opinion, been sustained, because the insole represented exactly what the bottom of the last shows, and the inner toe edge as the shoe is constructed, and it would be extremely difficult to apply the ruler as suggested by plaintiff to the edge, whereas the insole fills the space in the shoe from edge to edge and the inner toe edge on a straight line with the deflected lower side of said heel portion can be more definitely and certainly determined by applying the ruler to the insole.

The defendant's shoes style No. 500 (Exhibit 5), style No. 600 (Exhibit E), style No. 70 plaintiff's (Exhibit 6) and style Nos. 364 and 405 (Exhibit 4) do not infringe.

If, however, there be any doubt about the correctness of my decision on the mat-

ter of infringement, I will now consider the question of validity.

The only prior art offered on the trial was the same that was cited as a reference in the Patent Office herein, that is, Patent No. 984,506 issued to Edward W. Burt, for Therapeutic Shoe, granted February 14th, 1911, and it was over that patent, that the patent in suit was issued.

The defendant's Pediforme shoe style No. 70 (Exhibit 6) appears to me to have followed the Burt Patent No. 984,506 and, therefore, need not be further considered.

As to the other shoes of the defendant Pediforme it was selling each of these shoes charged to infringe for many years prior to the filing of the application for the patent in suit. The plaintiff has admitted knowledge and possession of a catalogue (Exhibit B), published by A. R. Garrod, the predecessor of Pediforme. Garrod's business, under the name of Pediforme, was started about 1914 and continued by him, until he sold the same to Cobb & Davis in August of 1916. A. R. Garrod died in September, 1916, and the testimony of his son, who was called as a witness on this trial, clearly shows that the catalogue, (Exhibit B), was published by his father between 1914 and 1916. A certificate of doing business under the name of Pediforme Shoe Company was filed by Cobb & Davis, on September 16th, 1916 (Exhibit I), and the address given in said certificate was the same as that where the defendant Pediforme is now located.

On page 6 of Exhibit B is shown and described a shoe having the inside straight line, and on page 4 the correct form for the shoe, showing the straight line on the inside of the toes.

Style Nos. 500 and 600 are listed on page 11 of Exhibit B, and were identified by Mr. Garrod, who was a witness on this trial, as identical with those sold at that time, and the shoes alleged in the complaint herein to infringe.

Mr. Ohlson, who has been employed by Thompson Brothers for some thirty-four years, in charge of lasts, testified that the management of Thompson Brothers changed on January 1st, 1916, and that the Pediforme last had been in the factory for several years prior to that time.

An insole pattern (Exhibit C) was produced by him and he testified that there had never been any change in that pattern. There was also produced by him, an original last (Exhibit F), which had been made in 1916 for a Mr. Wood, now deceased, who had been in the employ of Thompson Brothers and left when the new management came in. Exhibit F was leathered to suit Mr. Wood's foot, but, with that exception, he testified that it was identical with the Pediforme last, used in 1914, and ever since that time.

George Hanson, called as a witness by defendant, Waterbury, and Pediforme, testified that he was employed by the defendant Waterbury, for some thirty-seven years and identified the last used in the production of Exhibits 4 and 6. He produced, not only shoes made on the actual last, but also insole patterns of each of the types. He testified that the lasts on which plaintiff's Exhibit 4 were manufactured, (Exhibits J & K) had been in Waterbury's possession since 1914, and that the subsequent last No. 564 (Exhibit N) had come into the factory in 1916. Exhibit W is no longer used, but has been supplemented by Exhibit P, and that it is identical therewith in every respect except for the outside toe line. He also indicated on Exhibit Q, the only difference between the two lasts. He also produced Exhibits A, AA and BB, the last, the insole and the shoe known as the "West Pointer" respectively made by Waterbury for Rogers Peet & Company.

Mr. Payne testified that he was a buyer for Rogers Peet & Company in 1915, and that during that time there had been sent to Waterbury, at his instructions, the shoe "West Pointer", and that the last therefor was there when he joined Waterbury in September, 1918. A trademark for the shoe "West Pointer" was registered on October 19th, 1915, No. 106366, (Exhibit CC). Later on Mr. Payne became, and now is, the President of the defendant S. Waterbury & Son Co., Inc. Mr. Payne produced cash book entries showing sales to Rogers Peet & Company (Exhibit DD); sales to A. R. Garrod on October 3rd, 1914; and the Pediforme Shoe Company (Exhibit EE) on October 14th, 1916. He also testified that Pediforme style Nos. 364 and 405 were being manufactured in 1918, when he joined the Waterbury Company.

The witness Beyer produced a paper pattern (Exhibit FF) from which last No. 564 was made, which bears the date of October 23rd, 1914, in Mr. Beyer's own handwriting.

Plaintiff objects to the alleged prior use by defendants, as not having been

sustained by that character of evidence, which is necessary, if the presumption of validity, which attaches to a patent by its granting, is to be overcome, and contends that the testimony of Ohlson, with regard to the insole (Exhibit D) and the last (Exhibit F), made for Mr. Wood, did not represent the last and shoe from regular stock.

This does not seem to me to be sustained, as the last was identified by Ohlson, and generally speaking the proof of the insoles seems to me to be clearly established, and in determining what character of evidence defendants should be required to produce, we must not forget the long time, that was permitted to elapse, with the plaintiff alleging conception of the idea of the invention in 1902, reduction to practice in 1909, and the filing of an application in 1921, and the bringing of this action about a year before the patent expires. This certainly made a great change with reference to defendant's ability to introduce evidence and constituted laches on the part of the plaintiff.

Prior use by defendants has been established.

Laches, on the part of the plaintiff has likewise been established.

Plaintiff claimed to have conceived the invention in 1902, reduced it to practice in 1909, and to have filed his application for the patent in suit in 1921. The reasons suggested for the delay are certainly not impressive. Want of means between 1902 and 1909 certainly does not furnish a good excuse for the delay in the reduction to practice, and still less does it furnish an excuse for the delay between 1909 and 1921, when the application was filed, because plaintiff represented himself before the Patent Office on his application, and his only expense for fees was the fee of about $15 in the Patent Office.

We cannot forget that the time between 1909 and 1921 was not, in view of the testimony of plaintiff's witness Brander, devoted to improvement and experimentation, furthermore, during all the time between 1909 and the filing date of the patent, September 12th, 1921, the plaintiff was wearing his shoes in public, and they must have attracted public attention, as the plaintiff himself says that he received offers to purchase but did not sell. A delay of twelve years from the time of reduction to practice to the date of the application for the patent is so extended, especially when so poorly explained, as in the case at bar, constituted an abandonment of any invention which existed. United States Rifle & Cartridge Co. v. Whitney Arms Co., 118 U.S. 22, 6 S.Ct. 950, 30 L. Ed. 53; Consolidated Fruit Jar Co. v. Wright, 94 U.S. 92, 94, 24 L.Ed. 68, in which last case a period of eight to nine years intervened, between the completion of invention and the filing of the patent application and the Court said in part that "In Pitts v. Hall [Fed.Cas.No.11,192], 2 Blatchf. [229], 235, Mr. Justice Nelson said, 'The patentee may forfeit his right to the invention if he constructs it and vends it to others to use, or if he uses it publicly himself in the ordinary way of a public use of a machine at any time prior to two years before he makes his application for a patent. That is, he is not allowed to derive any benefit from the sale or the use of his machine, without forfeiting his right, except within two years prior to the time he makes his application.' See also American Hide & Leather Splitting & Dressing Mach. Co. v. American Tool & Mach. Co. [Fed.Cas.No.302], 4 Fish. Pat. Cas. [284], 291; McMillin et al. v. Barclay et al. [Fed.Cas.No.8,902], 5 Fish.Pat. Cas. 189; McClurg v. Kingsland, 1 How. 202 [11 L.Ed. 102]; Agawam Woolen Company v. Jordan, 7 Wall. 583 [19 L.Ed. 177]. The result must always depend upon the purpose and incidents accompanying the act or acts relied upon."

If the testimony of the plaintiff's witness, Brander, be accepted, then no change was made in the last after 1910 or 1911, and the only changes that were made must have been to fit it to plaintiff's own feet, therefore, it seems clear to me that plaintiff abandoned any claim to a patent by his delay and long public use.

Defendant complains that plaintiff's patent is void for want of utility.

I do not think that defense requires extended consideration, because if defendant be correct that plaintiff's patent is anticipated by its prior use, then certainly defendant could not claim that there was a lack of utility in that which they, by prior use, had anticipated.

Defendants do not infringe Claim 1, of the patent in suit, and in any event the claim numbered 1, of the patent in suit, is invalid.

For the reasons stated in this opinion, a decree may be entered in favor of the

**8**

defendants, against the plaintiff, dismissing the complaint herein with costs.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law, in accordance with this opinion for the assistance of the Court, as provided by the Federal Rules of Civil Procedure. and the Civil Rules of this Court.